A.H., a minor, by and through her father and next friend, Steve HERNANDEZ, Plaintiff

v.

NORTHSIDE INDEPENDENT SCHOOL DISTRICT, by and through its Board of Trustees; Robert Harris, in his official capacity as Principal of John Jay High School; and Jay Sumpter, in his individual capacity and in his official capacity as Principal of John Jay Science & Engineering Academy, Defendants.

Civil No. SA–12–CA–1113–OG.

United States District Court, W.D. Texas, San Antonio Division.

Jan. 8, 2013.

Jerri Lynn Ward, Garlo Ward, P.C., Lakeway, TX, for Plaintiff.

Stacy Tuer Castillo, Donald Craig Wood, Walsh, Anderson, Gallegos, Green & Tre-

vino, P.C., San Antonio, TX, for Defendants.

## ORDER

ORLANDO L. GARCIA, District Judge.

Pending before the Court is Plaintiff's Application for Preliminary Injunction (Dkt. # 8). Defendants have filed a response (Dkt. # 16), and the Court has held an evidentiary hearing (Dkt. # 17). After hearing the evidence and reviewing the parties' briefs and applicable law, the Court finds that Plaintiff's Application for Preliminary Injunction should be denied.

## I.

*Factual and procedural background* [1]

Northside Independent School District ("the District") is the State's fourth largest school district, covering approximately 355 square miles in a rapidly growing area.[2] The District is responsible for educating approximately 100,000 students.[3] The District operates about 72 elementary schools, 20 middle schools, 15 high school campuses and nine special/alternative schools.[4]

Plaintiff ("A.H.") is a 15 year old sophomore student attending John Jay Science and Engineering Academy, a magnet school in the District.[5] Plaintiff's home campus is Taft High School, but she applied and was accepted to the magnet school program in December 2011.[6] The magnet school is on the John Jay High School campus; thus, all magnet school students are subject to the same campus rules and regulations as Jay High School students.[7]

For many years, the District has required students to carry a name badge that contains a photo of the student, the student's name, and the name of his or her campus.[8] All employees also wear name badges, and every campus requires visitors to sign in at the front office and wear a visitor badge while on campus.[9] The badges allow school officials to confirm, at a quick glance, that the person wearing the badge has a legitimate reason for being on campus.[10] . In the past few years, the District also installed digital cameras in all high schools and middle schools, and is now installing cameras in elementary schools.[11] The buses are also equipped with digital cameras.[12] The digital cameras and identification badges are both intended to increase the safety and security of the students.[13] Plaintiff does not dispute that name badges and digital cam-

1. Unless noted otherwise, the facts are based on exhibits attached to and offered in support of the motion and response, the exhibits offered and admitted at the hearing, and the testimony of the witnesses who appeared at the hearing.

2. *http://www.nisd.net/content/northside-isd-destination-district*

3. Dkt. # 16, Exh. A, affidavit of Superintendent Woods.

4. *http://www.nisd.net/schools*; P Exh. # 3.

5. The Science & Engineering Academy is designed for students interested in pursuing a career in science, math, technology or engineering. (Dkt. # 16, Exh. A–11).

6. See Dkt. # 16, Exh. A–12; Plaintiff testified that she is currently interested in becoming an "interface web designer."

7. Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris.

8. *Id.*

9. *Id.*

10. *Id.*; Testimony of Superintendent Woods.

11. P Exh. # 1, August 10, 2012 letter to Jay H.S. parents from Principal Harris.

12. *Id.*

13. *Id.*; Dkt. # 16, Exh. A, Superintendent Woods affidavit and Exh. C, Principal Harris affidavit.

eras help provide a safe and secure school environment. She does not object to the digital cameras on campus, which monitor the students' daily activities. Nor did Plaintiff ever object to wearing a name badge while on campus—until now.

When school began in August, the District announced that it would be testing a new pilot program to further increase the safety and security of its students and hopefully increase State funding.[14] The pilot program is called the Smart ID Card Student Locator Project ("the Project").[15] The Project is slated to run for one year at only two campuses—John Jay High School and Jones Middle School.[16] The District will then evaluate the effectiveness of the program and decide whether to implement the program in future years.[17] The Project requires that the students use new identification badges called Smart ID cards that look like regular picture badges but contain a radio frequency identification (RFID) chip like those embedded in credit cards.[18] Aside from the chip inside the card, which is not noticeable, the cards resemble typical student ID badges.[19] The Smart ID badges still reflect the stu-

dent's picture, name and campus and still serve the same safety purposes by providing a uniform student ID that allows staff to readily determine that the student belongs on campus.[20] However, the chip in the Smart ID badge also enables school staff to locate a student on a campus with a very large student population.[21] The campus is equipped with sensors to read the card and school staff can determine the general whereabouts of the student carrying the card.[22] The sensors do not give an exact reading or pinpoint the precise location of a student (e.g. a specific classroom), but it would show whether the student is in a certain wing of the school.[23] The Smart ID badges work only within the school campus that has been equipped with sensors to read them.[24] The badges do *not* work off campus.[25]

The Smart ID badges are expected to improve safety by allowing school staff to know the whereabouts of a student that may be missing or unaccounted for in the event of a fire alarm or other emergency evacuation.[26] Very recently, a parent of a special needs student was concerned that the child did not get on the bus after

14. P Exh. # 1, August 10, 2012 letter; Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris.

15. *Id.*

16. *Id.*

17. Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris.

18. *Id.*

19. Plaintiff brought A.H.'s old ID badge and the shell of the new Smart ID badge to the hearing, and her father demonstrated how the shell was taken apart and chip was removed, leaving a badge that resembles any other ID badge.

20. Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris; testimony of Superintendent Woods.

21. Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris; *see also* P Exh. # 1, August 10, 2012 letter to parents (about 3,000 students attend school at the Jay H.S. campus).

22. Testimony of Superintendent Woods; Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris; P Exh. # 1, August 10, 2012 letter to parents.

23. Testimony of Superintendent Woods; Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris.

24. Testimony of Superintendent Woods; Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris; P Exh. # 1, August 10, 2012 letter to parents.

25. *Id.*

26. *Id.*

school and the school staff was able to pull the sensor readings to determine when the student was on campus and when he left, thus reassuring the parent.[27] On another occasion, a building was evacuated and campus administrators were able to quickly identify and locate students' badges that had been left in the building during the evacuation.[28]

The Smart ID cards also provide a more reliable and efficient method of determining daily student attendance, which impacts State funding.[29] The badges also function as multi-purpose "smart cards" that may be used to check out library books, purchase meals in the cafeteria, and purchase tickets for extracurricular activities.[30]

As in the past, the District strongly encourages students to wear their ID badges every day while they are on campus.[31] The students are discouraged from leaving, forgetting or exchanging their badges.[32] Whether the badges are worn around their neck, clipped to their backpacks or purses, or otherwise kept in their possession, the students are expected to have them readily accessible while on campus.[33]

On or about August 10, 2012, parents of Jay H.S. students were notified of the Smart ID program.[34] Because Plaintiff attends class at the Jay campus, her family received the notice.[35] Mr. Hernandez responded in protest and wrote a letter to the District, which was received on September 4, 2012.[36] The letter stated that the Hernandez family objects "to these RFID tracking badges."[37] Mr. Hernandez further stated that "[w]e firmly believe that it is our Hell Fire Belief that if we compromise our faith and religious freedom to allow you to track my daughter while she is at school it will condemn us to hell."[38] Mr. Hernandez stated that his daughter would not wear the Smart ID badge because it "steps on our religious freedom and civil liberties and privacy."[39] He requested that the District "put an end to this RFID tracking."[40]

On or about September 20, 2012, Deputy Superintendent Ray Galindo met with Mr. Hernandez informally to discuss his concerns.[41] Mr. Hernandez felt the chip in the badge was "the mark of the beast" and had a religious objection to the "tracking" of his daughter.[42] He also expressed a

27. Testimony of Superintendent Woods; Dkt. # 16, Exh. A, affidavit of Superintendent Woods.

28. Dkt. # 16, Exh. A, affidavit of Superintendent Woods.

29. Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris; P Exh. # 1, August 10, 2012 letter to parents.

30. *Id.*

31. *Id.*

32. *Id.*

33. Testimony of Superintendent Woods; Dkt. # 16, Exh. A and C, affidavits of Superintendent Woods and Principal Harris; P Exh. # 1, August 10, 2012 letter to parents.

34. P Exh. # 1, August 10, 2012 letter to parents.

35. Testimony of Steve Hernandez.

36. P Exh. # 4; Dkt. # 16, Exh. A–13.

37. *Id.*

38. *Id.*

39. *Id.*

40. *Id.*

41. Dkt. # 16, Exh. B, affidavit of Deputy Superintendent Galindo.

42. *Id.*

concern about the card's "potential for cancer."[43] Mr. Hernandez also believed that the card prohibited his daughter's "rights" as a student.[44] His objections were specifically concerned with the chip used in the badge.[45] Mr. Galindo offered an accommodation that would remove the chip from the badge.[46] Plaintiff would still need to wear the same badge as all other students on campus, "just without the chip or electronic components in the badge."[47] Mr. Galindo felt that "removing the chip resolved all of Mr. Hernandez's concerns."[48] On or about September 21, 2012, Mr. Hernandez e-mailed Mr. Galindo and stated that his daughter's "answer is NO!"[49] She would still refuse to wear the badge even without the tracking chip because wearing it would mean that she "falls in line and supports the program and she [would] be 'selling out' and NISD would be taking away her right to protest her religious freedom and compromise her faith."[50] Plaintiff then sent a letter to Superintendent Woods and Principal Harris, informing them that Plaintiff would refuse to wear the badge, even without a chip, stating that "we MUST obey the word of God. By asking my daughter and our family to participate and 'FALL IN LINE LIKE THE REST OF THEM' is asking us to disobey our LORD and Savior."[51]

On or about October 2, 2012, Mr. Galindo followed up on his meeting with Mr. Hernandez in a letter urging Plaintiff to accept the accommodation being offered "so that [A.H.]'s instructional program will not be affected."[52] Mr. Galindo reassured them that none of A.H.'s privileges at school would be restricted by wearing a chip-less badge, but reminded them that refusing to wear a uniform badge "as every other student and adult on the Jay campus is asked to do" would have consequences.[53]

Plaintiff then pursued a level I grievance, which Principal Harris heard on October 4, 2012.[54] During the conference, Mr. Hernandez again objected to A.H.'s wearing the Smart ID badge based on their religious belief that the technology in the card was akin to her wearing the "mark of the beast."[55] Mr. Hernandez again requested that the entire pilot program be ended.[56] Principal Harris summarized Plaintiff's complaints and the proposed solution in a letter dated October 9, 2012:

Complaint # 1—Because of religious objections, you are requesting that your daughter not be required to wear the new Smart ID badge.

- I respect your religious objection to wearing the ID badge because of the chip and therefore, I am granting relief to your complaint by allowing your child to wear the shell of the new Smart ID badge without the battery and chip. Your child will be required

---

**43.** *Id.;* see also P Exh. # 5.

**44.** Dkt. # 16, Exh. B, Galindo affidavit; P Exh. # 5.

**45.** Dkt. # 16, Exh. B, Galindo affidavit.

**46.** *Id.;* P Exh. # 5.

**47.** Dkt. # 16, Exh. B, Galindo affidavit; P Exh. # 5.

**48.** Dkt. # 16, Exh. B, Galindo affidavit.

**49.** Dkt. # 16, Exh. B–1.

**50.** Dkt. # 16, Exh. B and B–1.

**51.** P Exh. # 6.

**52.** Dkt. # 16, Exh. B and B–2; P Exh. # 5.

**53.** Dkt. # 16, Exh. B and B–2; P Exh. # 5.

**54.** Dkt. # 16, Exh. A–14.

**55.** Dkt. # 16, Exh. C, affidavit of Principal Harris.

**56.** *Id.*

to follow all other rules and regulations pertaining to the pilot program. Complaint # 2—Based upon religious objections you are requesting that the pilot program at John Jay be ended.

• I do not grant the relief of the pilot program being ended at John Jay High School. The relief granted clearly addresses your recognized religious objection of your child wearing the ID.

Please be advised that refusal to comply with the relief granted of wearing the Smart ID shell without a battery or chip will result in the withdrawal of your child from John Jay High School and the Science and Engineering Academy to her home campus. We are now at full implementation of the program and the expectation is that all students and staff wear the Smart ID badge. Your will be notified of this action, if after receipt of this letter your daughter still refuses to comply.

Dkt. # 16, Exh. C–1, P Exh. # 7.

Again, Plaintiff refused the accommodation being offered, and Mr. Hernandez sent another letter. The letter, received by the District on October 19, 2012, states in part:

If we allow [A.H.] to wear the chip free shell badge it would appear that we support the program. We do not support the program and by wearing the symbol (shell badge) of the program it would appear to others that we support the program and "fell in line like the rest" and "show support for the program" ... This is forced speech and my daughter does not want to be forced into expressing a position that she does not believe in.

Predicated on our religious belief we cannot allow it to even appear that we support the program, **Revelations 13:16, 17, "He causes all, both small and great, rich and poor, free and slave, to receive a mark on their right hand or** **on their foreheads, and that no one may buy or sell except one who has the mark or the name of the beast, or the number of his name."**

[I]f we· allow her to take the mark, in this case the shall badge it will appear that she is supporting wearing the mark and now she can participate in the economy of the school.

Dkt. # 16, Exh. A–15 (emphasis in original).

On or about November 13, 2012, the District replied, stating that Plaintiff would need to be transferred back to her home campus, where the students wear the old ID badges that Plaintiff had worn in the past. But if Plaintiff wished to change her stance on wearing the Smart ID badge with the battery and chip removed as offered, the District would rescind the withdrawal notice. P Exh. # 9.

On November 21, 2012, Plaintiff filed a lawsuit in state court and obtained a temporary restraining order. Dkt. # 1. The lawsuit was removed to federal court on November 27, 2012, and the temporary restraining order was extended by agreement to enable the parties to fully brief the issues prior to a preliminary injunction hearing.

Meanwhile, Mr. Hernandez continued with a level II grievance. Mr. Hernandez, A.H., their attorney, and a legal representative for the District appeared before a hearing officer. Dkt. # 16, Exh. A–16. After reviewing the record presented and hearing from the parties, the hearing officer sent a letter to Mr. Hernandez explaining his decision:

In your Level Two appeal request, you state that the District's offer to remove the chip from the student ID is not a sufficient remedy to your religious objections to the RFID program. As of the time of the grievance conference, [A.H.] continues to refuse to wear any

version of the RFID badge, with or without the chip located inside of the badge. At the conference, you stated that just removing the chip and only wearing the shell is not an acceptable remedy as this would indicate your daughter's support for "the program." The specific relief you requested was that your daughter be allowed to wear the I.D. badge she was issued her 9th grade year. Additionally, [A.H.] was given notice that based on her refusal to wear the appropriate identification badge while attending the Science and Engineering Academy housed at John Jay, starting at the beginning of the third six weeks, she would be removed from the John Jay campus and would be returned to her home campus, Taft High School. During the grievance conference you objected to this decision and stated that it was retaliation for expressing your religious beliefs.

After reviewing the information you and your daughter shared at the Level Two grievance, along with the responses from the informal and the Level One grievance complaints, the initial objection made by you about the RFID program was that the chip included in the badge worn at John Jay High School is for you akin to "the mark of the best" and objectionable to you based on your religious beliefs. In response to your objections, District administration agreed that [A.H.] could wear her identification card without a chip located within it. You declined that offer and shifted your objection to having to wear the identification badge at all as being against your religious beliefs because it would show your support for the program as a whole to have any type of badge that looks like the RFID badge. You also have made clear that your objections are with the entire RFID program and stated that "it is my sincere belief that you will put an end to this

RFID tracking of our children in our schools."

The District has attempted to work with your family to accommodate your religious beliefs and concerns with the RFID chip. The District has offered to let [A.H.] have a chip free RFID shell badge to respect your religious objection and during the conference I continued to grant that remedy to you. I understand your concern now to be that wearing any badge that has any resemblance to the RFID badges will be unacceptable to you based on your perception that wearing the badge will show support for the RFID program. While I respect your opinion, Northside ISD has the right to require students to wear identification badges at their campuses for purposes of safety and security. Neither [A.H.] nor your family needs to support Northside ISD's pilot program, but students are required to abide by certain rules, which in this instance is wearing the identification badge that is issued at the John Jay campus. Your objection to the entire RFID program is not sufficient grounds for [A.H.] to be exempted from wearing the identification badge required on the John Jay campus, especially in light of the fact that the District offered to remove the chip, which is the essence of the "mark" you have noted as your religious objection.

No one within Northside ISD has stated that your daughter needs to show support for the RFID program; what has been stated is that if she wishes to attend the John Jay campus, she will need to wear the identification badge issued to that campus. If she is unwilling to wear the identification badge issued to that campus, then [A.H.] will not be eligible to remain at that campus. That was the information relayed to [A.H.] in the letter sent by the District before the

start of the third six week period. As of the writing of this response, although I am aware that what campus [A.H.] attends is an issue currently being decided in the courts, it is still my recommendation and decision within this grievance that it is proper and appropriate for [A.H.] to be returned to her home campus for her refusal to comply with the rules for the John Jay campus. [A.H.] has the ability to receive nearly identical courses at Taft, she will not lose any credit and returning her to her home campus will resolve the concern about having to wear the RFID badge as that is not the identification being used at that campus.

In summary, as the remedies offered at Level Two, I am offering to provide [A.H.] with a chip free ID badge like the badge shown to you at the grievance conference. The badge will not have a chip in it and does not have the capacity to have a chip put in it. I am denying your requested remedy to allow [A.H.] to wear a different identification badge than the badges that have been issued for the john Jay campus. It is my belief that in offering the chip-free badge your religious concerns have been fully addressed. If [A.H.] wishes to pass out information showing her disagreement with the RFID program she can do so as long as she complies with Northside ISD policy regarding the distribution of literature on school grounds. Finally, inasmuch as I have the ability to do so, I am denying your requested remedy not to remove [A.H.] from the John Jay campus for her refusal to wear the appropriate identification badge issued for that campus.

Dkt. # 16, Exh. A–16, letter decision of hearing officer dated December 4, 2012.

On December 6, 2012, Plaintiff amended her complaint (Dkt. # 15) and shortly thereafter the parties completed their briefs on the preliminary injunction issues. On December 17, 2012, the Court held an evidentiary hearing, and heard the testimony of Superintendent Woods, A.H., and her father, Steve Hernandez. The temporary restraining order expired by its terms on December 19, 2012. The District agreed, however, that Plaintiff would be allowed to finish the semester on the Jay campus regardless of the Court's ruling.[57] At that juncture, if Plaintiff still refuses to wear the Jay H.S. student ID badge with the chip removed, the District will transfer A.H. back to her home campus at Taft High School, which is not participating in the Smart ID pilot program.

## II.

*Legal requirements for preliminary injunction*

To obtain a preliminary injunction, Plaintiffs must establish *each* of the following four factors:

(1) a substantial likelihood that she will prevail on the merits;

(2) a substantial threat of irreparable harm;

(3) the threatened injury to Plaintiff outweighs any potential harm to Defendants; and

(4) the injunction will not disserve the public interest.

*Ponce v. Socorro ISD*, 508 F.3d 765, 768 (5th Cir.2007); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985); *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567 (5th Cir.1974). A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four prerequisites. *Mississippi Power &*

**57.** The semester ends on January 18, 2013. P Exh. # 3.

*Light,* 760 F.2d at 621. The decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Id.* (citing *Callaway,* 489 F.2d at 576).

## III.

### Substantial likelihood of success on the merits

In Plaintiff's amended complaint, she asserts violations of her (1) Free Exercise rights under the First Amendment; (2) Free Speech rights under the First Amendment; (3) rights under the Texas Religious Freedom Act; (4) Due Process rights under the Fourteenth Amendment; and (5) Equal Protection rights under the Fourteenth Amendment.

 The Court begins its review by emphasizing that "public school officials have broad discretion in the management of school affairs and the courts should not lightly interfere with the daily operation of school systems." *Campbell v. St. Tammany Parish School Board,* 64 F.3d 184, 187–88 (5th Cir.1995). Although students in public schools "do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," the First Amendment rights of public school students "are not automatically coextensive with the rights of adults in other settings" and must be "applied in light of the special characteristics of the school environment." *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

### A. First Amendment: freedom to exercise religious beliefs

First, Plaintiff claims that her First Amendment right to freely exercise her religious beliefs will be violated if she is forced to wear the Smart ID badge. A.H.'s family practices the Christian faith and attends Cornerstone church, a non-denominational organization.[58] The father leads the family in Bible studies and he believes the Bible is literally the "Word of God." The family believes that, "according to scripture," the chip in the Smart ID badge is the "mark of the beast" as described in Revelation 13:16–17 as follows: "And he causeth all, both small and great, rich and poor, free and bond, to receive a mark in their right hand, or in their foreheads: and that no man might buy or sell, save he that had the mark, or the name of the beast, or the number of his name."[59] Mr. Hernandez testified that the "Antichrist wants to control every move," and he believes the "tracking chip" in the Smart ID badge "tracks the children's every move in school."[60] A.H. testified that she also believes the "Antichrist forces the mark on you and invades your privacy." Yet Plaintiff insists that she is not bring-

---

58. Defense counsel asked Mr. Hernandez if he was aware that Smart ID badges are used at the Vatican for security purposes. Mr. Hernandez stated that his faith has "no connection to Catholicism."

59. Revelation 13:16–17 (King James). *http://www.bartleby.com/108/66/13.html# S22; http://www.kingjamesbibleonline.org/ Revelation–Chapter–13/.*

60. Plaintiff's allegation that the chip is a "tracking" device that "tracks the students' every move" is based on his subjective belief. There is no evidence that the Smart card

enables the administrators to "track the students' every move" nor is there any evidence that they are even interested in doing so. The card does not photograph or record the students, nor does it "track" the students in bathroom stalls, as Mr. Hernandez implied during his testimony. Mr. Hernandez also believes the chip is radioactive and poses a health risk. Again, there is no objective evidence to support his subjective belief. While the Court accepts A.H.'s subjective religious beliefs about the chip, it need not accept his subjective beliefs about the technological capabilities and/or environment hazards, if any, associated with the chip.

ing a cause of action for invasion of privacy.

The record clearly reflects that Mr. Hernandez has been pushing for dissolution of the entire NISD pilot program, but he clarified at the hearing that he is "asking for religious accommodation" for A.H. only. As Mr. Hernandez testified at the hearing, the "tracking chip" is the source of their objection because he believes it emits a signal that tracks his daughter's every move. He testified that removal of the chip "would remove [his] concern to a certain extent." The District has repeatedly offered to remove the chip from A.H.'s badge as an accommodation, and Plaintiff has refused the accommodation.

1. Level of scrutiny

■ Under heightened scrutiny, the free exercise inquiry focuses on "whether the government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling government interest justified the burden." *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). However, when the government imposed rule or regulation being challenged is *neutral and of general applicability,* it need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. *Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).[61] Instead, the rule or regulation need only be rationally related to a legitimate government interest to survive a con-

stitutional challenge. *Id.* Neutrality and general applicability are interrelated. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

■ Federal courts reviewing a free exercise challenge post-*Smith* have begun their analysis by looking at the rule or regulation at issue to determine which level of scrutiny should apply. In this case, Plaintiff is challenging the District's mandatory rule that every student on campus carry the same student ID badge for identification, safety and security purposes. On the Jay H.S. campus, the uniform ID badge issued to the students happens to be a Smart ID badge; thus, the District requires every student on the Jay campus to carry the same Smart ID badge. This rule is quintessentially a neutral policy that is generally applicable to every student on campus. *See Smith,* 494 U.S. at 884, 110 S.Ct. 1595 (Oregon's drug law that included peyote as a controlled substance was neutral and generally applicable to all Oregon citizens); *see also Jacobs v. Clark County School Dist.,* 526 F.3d 419, 439 (9th Cir.2008) ("a school uniform policy like Liberty's is the quintessence of a 'neutral [rule] of general applicability'"); *see also Littlefield v. Forney ISD,* 268 F.3d 275, 292 (5th Cir.2001)(on its face, the school uniform policy with opt-out provision was neutral and of general application). Thus, the rational basis test should apply.

Plaintiff disagrees, and contends strict scrutiny should apply because she is asserting more than a free exercise chal-

---

**61.** In direct response to the *Smith* decision, Congress attempted to resurrect the pre-*Smith* strict scrutiny test when it passed the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. The Supreme Court declared the Act unconstitutional as applied to the states (and their political subdivisions) and reaffirmed the rational basis test used in the *Smith*

decision. *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Congress again responded with the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, but its scope is limited to land use issues and the religious rights of institutionalized persons.

lenge.[62] She is also alleging that other constitutional rights have been infringed for other reasons.[63] While the Court does not agree that strict scrutiny applies, it will analyze Plaintiffs claims under both the rational basis and strict scrutiny tests to determine whether Plaintiff would have a likelihood of success under either analysis.

2. The District's badge requirement easily passes the *Smith* rational basis test

■ Again, the District requires that every student on the Jay H.S. campus wear the same ID badge which happens to be a Smart ID badge. The rule is neutral in both purpose and application, as the entire student body is subject to the requirement. The rule serves many purposes that have nothing to do with religion, religious beliefs, or religious practices. The District has a legitimate need to easily identify its students for purposes of safety, security, attendance and funding, and the requirement that all students carry a Smart ID badge is certainly a rational means to meet such needs. While not a paramount concern, the Smart ID badge is also a useful tool for the students because it serves as a convenient means of payment for lunch and extra-curricular activities and assists students in checking out library books.

Plaintiff has refused to comply with the uniform Smart ID badge requirement, and instead wants to carry an old ID badge that was issued to her at a different campus. Superintendent Woods testified that uniformity in ID badges is important because campus administrators and others can determine, at a quick glance, that the person wearing the badge belongs on that campus. Quite obviously, the purpose of the badge would be meaningless if every student could pick or choose whichever badge he or she desired. The District's badge requirement has a incidental effect, if any, on Plaintiff's religious beliefs. *See Cornerstone Christian Schools v. Univ. Interscholastic League,* 563 F.3d 127, 137 (5th Cir.2009) ("Any burden on free exercise is nearly imperceptible"). To the extent that any burden exists, it has been removed by the District's offer of accommodation.

3. The District's requirement also passes heightened scrutiny

■ At this stage of the proceedings, the Court will assume that this is "not a situation where a person adopts a random object as a religious talisman and now seeks First Amendment protection for it." *Chalifoux v. New Caney ISD,* 976 F.Supp. 659, 670 (S.D.Tex.1997). In other words, the Court will assume that Plaintiff holds a "sincere religious belief" that the *chip* in the Smart ID badge is "the mark of the beast." However, Plaintiff has failed to show that carrying a Smart ID badge containing a chip imposes a **substantial burden on the observation of a central religious belief.** *See Adkins v. Kaspar,* 393 F.3d 559, 570 (5th Cir.2004), cert. denied, 545 U.S. 1104, 125 S.Ct. 2549, 162 L.Ed.2d 275 (2005) ("in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his

---

62. Dkt. # 8, pp. 5–6.

63. The Court rejects the notion that a plaintiff may dictate the level of scrutiny applied by the Court in its legal analysis by simply *alleging* more than one constitutional violation. The "hybrid rights" theory that Plaintiff is

asserting has been widely criticized, *Jacobs,* 526 F.3d at 440 n. 45 (and cases cited therein), and the Fifth Circuit has applied the *Smith* test even when other constitutional challenges have been asserted. *See Littlefield,* 268 F.3d at 292.

religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs").

In fact, Plaintiff's complaints suggest that a burden, if any, has been caused by her *refusal* to carry the Smart ID badge. Mr. Hernandez testified that a person can only participate in the world economy if he or she takes the mark of the beast. If A.H. "takes the mark," she would be "forced to participate in the school economy." When asked what he means by "school economy," Mr. Hernandez stated that it means buying things and participating in school functions. On one hand, Mr. Hernandez doesn't want his daughter to participate in anything that involves using the Smart card and A.H. seems to concur. On the other hand, A.H. complains that she is unable to do some things in the same manner as the students equipped with a Smart card, such as paying for lunch in the same lunch line and checking out library books with the same ease. Thus, while Plaintiff complains that her *refusal* to carry a Smart card creates an inconvenience or burden, she has failed to show that carrying a Smart ID badge during school hours and at school functions for identification purposes will impose a *substantial burden on her ability to exercise her religion.* Plaintiff has always carried a student ID badge and she is not being compelled to do anything different, or anything more, than what she has done for several years as a public school student. Plaintiff can continue to disagree with the Smart ID pilot program and she can continue to exercise her religious beliefs even if she carries a Smart ID badge during school hours. *See Mozert v. Hawkins Co. Board of Education,* 827 F.2d 1058, 1070 (6th Cir.1987), cert. denied, 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988) (requirement that students read a particular series of books containing numerous passages that offended plaintiffs' religious beliefs did not mean that students were required to affirm or deny a belief or engage or refrain from engaging in a practice prohibited or required by their religion). As Plaintiff acknowledged during her testimony, she has never been told by school officials that she can't discuss or exercise her religious beliefs. Nor has she been told that she must agree with or support the pilot program. As Superintendent Woods testified, the students are simply expected to have their ID badges readily accessible, which Plaintiff has been accustomed to doing. Plaintiff does not need to wear the badge on her chest or even around her neck. Plaintiff is not required to participate in "the school economy," although she has done so in the past. If Plaintiff so desires, she can bring her lunch from home, read books in the library without checking them out, and pay cash for tickets for extracurricular events to the extent she wants to attend any events or activities.

Even if Plaintiff could show a substantial burden, the District has a compelling governmental interest that outweighs such burden. In today's climate, one would be hard pressed to argue that the safety and security of the children and educators in our public school system is not a compelling governmental interest. Mandatory identification badges issued to all students, staff, and visitors further the school's interest in providing a safe and secure environment for everyone on campus. One could envision many different methods of ensuring safety and security in schools, and the requirement that high school students carry a uniform ID badge issued for those attending classes on campus is clearly one of the least restrictive means available.

4. The accommodation offered by the District clearly passes constitutional muster:

■ Even assuming *arguendo* that a strict scrutiny test were applicable and the District's requirement did not pass such test, the argument has become moot because the District has offered Plaintiff an accommodation that clearly removes her religious objection to wearing a Smart ID badge containing a chip (i.e. "the mark of the beast"). Since the inception of the pilot program, Plaintiff has refused to wear the Smart ID badge because she believes the *chip* is the "mark of the beast." The District acknowledged her "sincerely held religious belief" and removed the chip, but Plaintiff still refused to wear the ID badge. Plaintiff does not contend that she has a "sincerely held religious belief" that wearing the badge without a chip is still the mark of the beast. And only with prompting by her counsel did A.H. agree that wearing the badge without a chip would mean she has to "bear false witness" to a program that she disagrees with. Thus, Plaintiff's objection to wearing a badge without a chip is not grounded in her religious beliefs.

Again, Plaintiff has been wearing a student ID badge for several years. She doesn't object to wearing her old ID badge, yet she objects to the new ID badge issued by Jay H.S. despite the fact that the chip has been removed. Plain-

tiff's objection to wearing the Smart ID badge without a chip is clearly a secular choice, rather than a religious concern. A.H. and her father have publicly voiced their objection to the entire pilot program, and her father believes that wearing the student ID badge without a chip would give the appearance of acquiescence. Mr. Hernandez testified that A.H.'s acceptance of the accommodation would "put a smiley face" on the pilot program. It would "make a statement that [A.H.] fell in line to support the program" and he would "look like a fool." The First Amendment does not protect such concerns. The accommodation offered by the District is not only reasonable—it removes Plaintiff's religious objection from legal scrutiny all together.[64] Plaintiff is not likely to succeed on the merits of her free exercise claim under the First Amendment.[65]

B. *First Amendment: freedom of speech*

Next, Plaintiff claims that her free speech rights under the First Amendment will be violated if she accepts the District's accommodation and is forced to wear a Smart ID badge without a chip because it constitutes "compelled speech." Both A.H. and her father testified that the student ID badge, without a chip, looks like the other badges and would "show support for the [pilot] program." The fact that the ID badge without a chip looks like the

---

64. Plaintiff contends this case is similar to *A.A. v. Needville ISD*, 701 F.Supp.2d 863 (S.D.Tex.2009), aff'd, 611 F.3d 248 (5th Cir. 2010). The Court must disagree. In that case, the plaintiff wanted to wear his hair visibly long in deference to his Native American heritage and religious beliefs. The school district told the student to tuck his braided hair down the back of his shirt, but the court found that it simply exacerbated the burden on plaintiff. Here, the District is offering to remove the chip—the source of Plaintiff's religious concern—which removes the burden, if any, altogether.

65. This case may be most similar to the school uniform cases such as *Littlefield* and *Jacobs*, in which mandatory school uniform policies were deemed to be constitutional. But in this case, the safety and security of the students and educators is a more compelling interest than promoting school spirit, decorum, respect for authority and decreasing socioeconomic tension. If mandatory school uniform policies pass constitutional muster, a mandatory student ID requirement surely passes constitutional muster.

other students badges is precisely why the District is asking Plaintiff to wear it. Again, Superintendent Woods stressed that uniformity in campus badges is important so that personnel can readily identify the person carrying the badge as a student that belongs on *that campus.* Yet A.H. claims that even a badge without a chip is a "symbol of their program" and she doesn't agree with the program so she doesn't want to wear the badge.

The question is whether that which is being coerced (wearing a student ID badge) is a form of speech under the First Amendment. If that which is being coerced is not speech, then speech is not being coerced and the inquiry ends. *Littlefield*, 268 F.3d at 295 (Barksdale, J., concurring). "The First Amendment protects not only verbal and written expression, but also symbols and conduct that constitute 'symbolic speech.'" *Littlefield*, 268 F.3d at 282 (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)). In determining whether particular conduct (such as wearing a student ID badge) possesses "sufficient communicative elements," to trigger First Amendment protection, "courts must ask whether '[a]n intent to convey a particularized message was present, and ... [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoting, in part, *Tinker*, 393 U.S. at 505–06, 89 S.Ct. 733).

The District contends that wearing or carrying a student ID badge is not expressive conduct under the First Amendment. The student ID badge, with or without the chip, is not meant to convey a particularized message, or any message at all. It is simply meant to identify the person carrying it as a student on that campus.

The Court must agree with the District. Wearing a student ID badge does not com-

municate support for the pilot program, or convey any type of message whatsoever. *Jacobs,* 526 F.3d at 438 ("[The school] does not force [the student] to communicate any message whatsoever—much less one expressing support for conformity or community affiliation—simply by requiring him to wear the solid-colored tops and bottoms mandated by its uniform policy"). Even if Plaintiff subjectively believes that she will be conveying a message of support by wearing the student ID badge, it is highly unlikely that such a message would be understood by others who viewed it. In fact, if all the Jay H.S. students wearing a Smart ID badge were asked whether they support the pilot program, some might say they support it and others might say they don't support it. Wearing a student ID badge is not expressive conduct that implicates the First Amendment. It is simply a means of identifying the person wearing it, and nothing more.

Even if wearing a student ID badge did constitute expressive conduct, the District's student ID requirement passes constitutional muster under the *O'Brien* standard, which is the analytical framework used when non-speech conduct is in dispute. The requirement is within the District's power and authority; the rule furthers an important or substantial governmental interest; it is unrelated to the suppression of students expression; and the incidental restrictions on First Amendment activities, if any, are no more than necessary to further that interest. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Littlefield*, 268 F.3d at 286–87.

C. *Texas Religious Freedom and Restoration Act*

The State of Texas has its own statute relating to governmental intrusion on a person's free exercise of religion.

The statute is known as the Texas Religious Freedom and Restoration Act ("TRFRA"), codified in section 110.003 of the Texas Civil Practice and Remedies Code.[66] Under the statute, "a government agency may not substantially burden a person's free exercise of religion." Tex. Civ. Prac. & Rem. Code Ann. § 110.003 (Vernon 2011). However, there is no violation "if the government agency demonstrates that the application of the burden to the person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest." *Id.* "Free exercise of religion" means an act or refusal to act that is substantially motivated by sincere religious belief. Tex. Civ. Prac. & Rem. Code Ann. § 110.001 (Vernon 2011). And "according to the Texas Supreme Court, a burden under TRFRA is substantial if it is 'real vs. merely perceived, and significant v. trivial.'" *Merced v. Kasson*, 577 F.3d 578, 588 (5th Cir.2009).

 The Court has already addressed, in its First Amendment analysis, the lack of evidence on "substantial burden." The burden on Plaintiff, if any, does not meet the Texas Supreme Court's definition of "substantial." And even if Plaintiff's objection to wearing the Smart ID badge with a chip is "substantially motivated by sincere religious belief," her objection to wearing the badge without a chip is not motivated by a sincere religious belief. The Court has likewise discussed the District's compelling interest in providing security and safety on its campuses and how a mandatory student ID requirement is probably the least restrictive means available for ensuring the safety and security of the students and educators.

Even more importantly, however, is the "right to accommodate" under the statute. Plaintiff is not likely to succeed on her claim because the Texas statute specifically precludes a cause of action under the statute when the governmental entity offers a remedy. Section 110.006 states, in relevant part:

(c) A governmental agency that receives a notice under Subsection (a) may remedy the substantial burden on the person's free exercise of religion.[67]

(d) A remedy implemented by a government agency under this section:

(1) may be designed to reasonably remove the substantial burden on the person's free exercise of religion;

(2) need not be implemented in a manner that results in an exercise of governmental authority that is the least restrictive means of furthering the governmental interest, notwithstanding any other provision of this chapter; and

(3) must be narrowly tailored to remove the particular burden for which the remedy is implemented.

(e) A person with respect to whom a substantial burden on the person's free exercise of religion has been cured by a remedy implemented under this section *may not bring an action* under Section 110.005.

Tex. Civ. Prac. & Rem. Code Ann. § 110.006(c)-(e)(emphasis added).

The District has offered Plaintiff two alternative accommodations: (1) wear the student ID badge issued to Jay H.S. students with the chip removed; or (2) transfer to her home campus, where she may

---

**66.** The Texas statute is substantially similar to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, which was declared unconstitutional as applied to the states.

**67.** It is questionable in this case whether Plaintiff provided timely notice under the statute, but the Court need not address that issue today.

wear her old student ID badge. Thus, Plaintiff's cause of action is precluded.

### D. *Due Process rights under the Fourteenth Amendment*

■■■ Plaintiff further claims that the District has violated her Fourteenth Amendment right to due process because they have indicated that she will be transferred back to her home campus if she refuses to wear the student ID badge issued to Jay H.S. students. To prevail on her due process claim, Plaintiff must show that she has a constitutionally protected liberty or property interest in attending the Academy program at the Jay H.S. campus rather than her home campus. While Plaintiff does have a property interest in a state-provided public education, she does not have a protected property interest in attending school at a campus of her choice. Nor does she have a constitutional right to a specific curriculum, courses of her choice, or extra-curricular activities. *Nevares v. San Marcos Consol. ISD*, 111 F.3d 25, 26 (5th Cir.1997); *Khan v. Fort Bend ISD*, 561 F.Supp.2d 760, 764–65 (S.D.Tex.2008).[68] Because Plaintiff has no constitutionally protected liberty or property interest in the courses offered through the Academy program, no process is due under the Fourteenth Amendment. *Khan*, 561 F.Supp.2d at 765.

At this juncture, Plaintiff still has a choice. If she wants to remain on the Jay H.S. campus, she will need to wear the student ID badge issued for that campus. If she does not want to wear the badge issued for that campus, the District has the discretion to transfer Plaintiff back to the Taft H.S. campus where she can wear her old student ID badge. As Superintendent Woods testified, the core curriculum and many of the electives are the same, and no disciplinary mark would be reflected on Plaintiff's student record. At most, it appears that perhaps a notation of transfer between campuses may be reflected.

### E. *Equal Protection rights under the Fourteenth Amendment*

■■■ Plaintiff also claims that she has been "singled out" by the District as the result of her refusal to wear the Smart ID badge. However, neither the District's requirement nor the District's conduct in response to Plaintiff's refusal has resulted in unequal treatment. The student ID requirement applies to all students on campus, not just Plaintiff. And the District's accommodation to remove the chip from the badge would remove Plaintiff's religious objection and enable her to remain on campus just like all other students. Because Plaintiff refuses to carry the Smart ID badge, she has to stand in a different lunch line for those who are not carrying their Smart card and must pay for lunch by other means. Plaintiff also alleges that she was questioned about her badge when she checked out a library book, and that she was unable to vote for the homecoming king and queen. Because the campus is now equipped for Smart cards, Plaintiff may be inconvenienced. But the inconvenience is the result of Plaintiff's own decision to refuse the Smart card. It is not the result of any action by the District, nor does it rise to the level of a constitutional violation.

### IV.

#### *Irreparable injury*

■■■ Plaintiff has not shown a constitutional violation, which she contends would

---

68. Plaintiff claims she has "earned the right" to be in the Academy program. (Dkt. # 8, p. 12). Simply because Plaintiff academically qualifies for the program under the District's own rules does not mean that she has a constitutional right to be in the program or attend school at the Jay campus.

be "per se irreparable injury." Any harm that Plaintiff believed she would suffer as the result of wearing a Smart ID badge containing a chip has been removed. And Plaintiff will not suffer irreparable injury if she is transferred back to her home campus, Taft High School, which she attended in the past. At Taft High School, Plaintiff will not be expected to wear the Jay H.S. badge that she has so vehemently objected to wearing. There is simply no threat of injury to Plaintiff, much less irreparable injury.

## V.

### *Balancing the harm*

██ There has been no harm to Plaintiff, and there is no foreseeable harm to Plaintiff in the future. On the other hand, tying the District's hands and preventing its administrators to exercise their discretion always raises a concern. The scales tip in the District's favor.

## VI.

### *Public interest*

██ While the public interest may not be "disserved" if an injunction that concerns only one student is issued, the public interest would certainly be better served if no injunction is issued. As federal courts have repeatedly emphasized, public school officials have broad discretion in the management of school affairs and the courts should not lightly interfere with the daily operation of school systems. Students in public schools are expected to conform to basic rules, such as wearing an ID badge, which benefit the school as a whole.

---

**69.** Again, the District agreed to wait until the end of the current grading period and the

## VII.

### *Conclusion*

For these reasons, Plaintiff has failed to meet all requirements for a preliminary injunction. An injunction is an extraordinary remedy, which is not warranted herein. Plaintiff's Motion for Preliminary Injunction (Dkt. # 19) is DENIED.

Plaintiff shall give written notice to the District prior to the end of the current semester stating whether she intends to accept the accommodation being offered and wear the Smart ID badge without a chip. If Plaintiff refuses to wear the uniform badge issued to all students at Jay High School, even without a chip, the District may exercise its discretion and transfer Plaintiff back to her home campus, where she can wear her old student ID badge.[69]